Receipt number AUSFCC-8390733

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| LOCKHEED MARTIN CORPORATION, | |
| Plaintiff, | Case No.   **22-1854** C |
| v. | |
| THE UNITED STATES, | |
| Defendant. | |

## **COMPLAINT**

## TABLE OF CONTENTS

**Page**

COMPLAINT ............................................................................................................. 1

PARTIES .................................................................................................................... 1

NATURE OF THE ACTION ...................................................................................... 1

JURISDICTION AND STANDING ........................................................................... 3

PREVIOUS LAWSUITS ............................................................................................ 4

STATEMENT OF THE CASE..................................................................................... 4

I.   How the Government Orders, and Assumes Rights—Not Ownership—in,
Intellectual Property ....................................................................................... 4

A.  Government Interests in Intellectual Property, Generally ........................... 4

B.  How the Government Perfects Its License Rights in Technical Data and
Computer Software ...................................................................................... 7

II.  The GPS III and IIIF Programs.......................................................................... 8

A.  GPS III Systems and Blocks....................................................................... 8

B.  GPS III Program ......................................................................................... 9

C.  GPS Block IIIF Acquisition...................................................................... 10

1.  GPS IIIF Acquisition Phase I........................................................... 10

2.  GPS IIIF Acquisition Phase II ......................................................... 10

3.  Lockheed Martin's Comments Regarding Data Acquisition
Requirements on GPS IIIF Draft RFP ............................................. 11

4.  Details of the Final RFP's Data Acquisition Requirements ............... 12

5.  The Government Modified the Solicitation to Confirm It Was Not
Requiring Offerors to Relinquish Data Rights Developed Exclusively at
Private Expense ................................................................................ 15

6.  Pre-Proposal Communications Confirmed the Government Was Not
Requiring Offerors to Relinquish Data Rights Developed Exclusively at
Private Expense ................................................................................ 15

7.  Lockheed Martin Followed the Plain Language of the GPS IIIF Final
RFP, Government Guidance and DOD Policies to Draft Its Proposal ................ 17

i

8. Lockheed Martin Submitted Its Proposal Relying on the Government's Statement to Narrowly Construe the Data Deliverables under the Contract ........................................................................................................ 21

    (a) Lockheed Martin's Proposal Identified Software Developed at Private Expense and Did Not Give GPR to that Software ....................... 21

    (b) Lockheed Martin's Proposal Disclosed How It Would Provide Software Consistent with the Plain Language of the Final RFP .............. 24

9. The Government Awarded Lockheed Martin the GPS IIIF Contract without Questioning the Proposal ......................................................... 26

10. The Parties Bilaterally Approved a Modification Consistent with Lockheed Martin's Interpretation of the Contract ................................. 27

D. Three Years after Contract Award, the Government Asserted the Flight Software Executable and Source Code Are Deliverables ........................... 28

E. Lockheed Martin Requested and the Government Denied Modification to the GPS IIIF Contract .................................................................................. 30

F. The Government Issued a COFD Directing Lockheed Martin to Deliver the Flight Software Executable and Source Code with GPR ........................... 31

G. The Government Rejected Lockheed Martin's OBC Software Submission .............. 32

COUNTS ............................................................................................................. 32

COUNT I Declaratory Judgment - Lockheed Martin's Interpretation of the Contract Is Correct ....................................................................................................... 33

COUNT II Declaratory Judgment - Under the Doctrine of Contra Proferentem, Lockheed Martin Is Not Required to Deliver Flight Software Executable and Source Code under CDRL A032 ......................................................................... 35

COUNT III Declaratory Judgment - the Government's Interpretation Violates 10 U.S.C. § 2320(a)(2)(H) and DFARS 227.7203-1(c) ............................................. 37

COUNT IV Declaratory Judgment - Unilateral Mistake ....................................... 39

COUNT V Declaratory Judgment - Mutual Mistake .............................................. 41

COUNT VI Declaratory Judgment - Superior Knowledge ...................................... 42

COUNT VII Declaratory Judgment - Breach of Contract - Violation of DFARS 252.227-7014 and 252.227-7019 ........................................................................ 44

PRAYER FOR RELIEF ...................................................................................... 46

## COMPLAINT

Plaintiff Lockheed Martin Corporation ("Lockheed Martin"), through undersigned counsel, asserts the following claims against the United States (the "Government"). For its Complaint, Lockheed Martin alleges as follows:

## PARTIES

1.      Lockheed Martin is a Maryland corporation, with its principal place of business located at 6801 Rockledge Drive, Bethesda, Maryland 20817. Lockheed Martin develops technologically advanced and integrated products, services and solutions through four primary business areas: (a) Aeronautics, (b) Missiles and Fire Control, (c) Rotary and Mission Systems and (d) Space.

2.      The Government awarded the contract at issue in this case to Lockheed Martin, and it is under the purview of the Space business area.

3.      Lockheed Martin Space is headquartered in Littleton, Colorado and develops, among other things, commercial and military satellites, space probes, missile defense systems and National Aeronautics and Space Administration's ("NASA") Orion spacecraft.

4.      Defendant is the Government acting through the United States Space Force, as a component of the Department of the Air Force.

## NATURE OF THE ACTION

5.      This is a case about how the Government orders computer software and technical data from its contractors, as well as the Government's transparency about its requirements in its acquisition documents. It raises important questions about how the Government is required to draft a Request for Proposal ("RFP") following its own internal rules; how the Government should conduct itself in pre-proposal discussions with potential contractors; and how contractors should read RFP requirements to understand what the Government is ordering.

1

6.     At its most basic, this is a dispute about what computer software and technical data Lockheed Martin is required to deliver to the Government under Contract FA8807-18-C-0009, known as the Global Positioning System ("GPS") IIIF Contract (the "Contract" or "GPS IIIF Contract"), and specifically, what intellectual property rights the Government obtains in that technical data and computer software.

7.     The Contract involves, among other things, flight software used to position and operate a GPS satellite. The Government contends it unambiguously ordered "delivery" of flight software executable and source code and that the Contract requires Lockheed Martin to deliver that software with Government Purpose Rights ("GPR"), despite the fact that the software was developed at private expense by Lockheed Martin and its subcontractors. The Government is in effect unilaterally rewriting the Contract for its own purposes, which violates fundamental contract interpretation principles.

8.     Lockheed Martin contends the Government only ordered a flight software "Software Product Specification" (SPS). To Lockheed Martin's understanding, the SPS is a written document—not software executable or source code —that describes the design and operation of software and acts as supporting documentation for the software. While the SPS document may reference flight software executable and source code, the SPS document does not require Lockheed Martin to deliver software executable and source code to the Government with GPR.

9.     As shown below, the plain language of the Contract, the Government's pre-award conduct, and the rules and structure pertaining to the Government's acquisition of technical data and software all support Lockheed Martin's interpretation of its obligations under the Contract.

10.     Accordingly, Lockheed Martin seeks a declaration that the Contract does not require it to deliver software executable and source code to the Government and the Contracting Officer's Final Decision ("COFD") attempting to require Lockheed Martin to deliver flight software executable and source code is void (**Count I**). Even if the Court finds the Government's interpretation is correct (which it should not), Lockheed Martin requests a ruling that it be relieved from delivering flight software executable and source code with GPR because: the contract is ambiguous and should be construed against the Government (**Count II**); the Government's interpretation violates the public policy behind 10 U.S.C. § 2320(a)(2)(H) and Defense Federal Acquisition Regulation Supplement ("DFARS") 227.7203-1(c) (both of which protect Lockheed Martin and its subcontractors from surrendering intellectual property rights developed at private expense) (**Count III**); Lockheed Martin made a unilateral mistake regarding Contract interpretation (**Count IV**); the parties were mutually mistaken regarding Contract interpretation (**Count V**); the Government failed to disclose its superior knowledge to Lockheed Martin regarding its interpretation of the Contract (**Count VI**); and the Government breached the Contract when it denied Lockheed Martin the opportunity under DFARS 252.227-7014 to amend its data rights assertions (**Count VII**).

## JURISDICTION AND STANDING

11.     This Complaint seeks *de novo* review of the claims set forth in the COFD pursuant to 41 U.S.C. § 7104(b)(4).

12.      This Court also has jurisdiction over the claims set forth in this Complaint pursuant to 28 U.S.C. § 1491(a)(2), which states this Court:

> [S]hall have jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 7104(b)(1) of title 41, including a dispute concerning . . . rights in tangible or intangible property . . . and other nonmonetary disputes on which a decision of the contracting officer has been issued under section 6 of that Act.

3

13.     28 U.S.C. § 1491(a)(1), which states this Court "shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress . . . in cases not sounding in tort," further provides this Court with jurisdiction over Lockheed Martin's statutory claim under 10 U.S.C. § 2320(a).[1]

14.     Lockheed Martin has standing to file this action because it involves a contract dispute between Lockheed Martin and the Government regarding the scope of required deliverables and associated data rights under the GPS IIIF Contract. The Government demands those deliverables be delivered with a particular license, some of which Lockheed Martin itself does not have, and refuses to adhere to the procedural requirements of DFARS 252.227-7014 and 252.227-7019, which permit post-award assertions in data rights based upon new information or inadvertent omission.

## PREVIOUS LAWSUITS

15.     Lockheed Martin has not initiated other lawsuits in either state or federal court dealing with the same or similar facts involved here.

## STATEMENT OF THE CASE

**I.      How the Government Orders, and Assumes Rights—Not Ownership—in, Intellectual Property**

**A.      Government Interests in Intellectual Property, Generally**

16.     The government has a property interest in intellectual property generated in furtherance of a government contract.

17.     The government's interest remains inchoate until the government orders, and the

---

[1] Congress transferred subsection (a) of 10 U.S.C. § 2320 to 10 U.S.C. § 3771. William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, § 3775, 134 Stat. 4226 (2021). Congress codified the text formerly found in subparagraph (a)(2)(H) of 10 U.S.C. § 2320 at paragraph (b)(8) of 10 U.S.C. § 3771.

contractor delivers, the intellectual property.

18. When the government orders and the contractor delivers intellectual property under government contracts, the contractor retains legal title to the intellectual property. The government *only* receives a license to intellectual property ordered and delivered under a government contract.

19. To perfect the government's license rights in intellectual property, the government contract must describe and order the intellectual property, state delivery requirements, and define the scope of the government's license to the technical data and software delivered.

20. The government's policy is to acquire only the computer software, computer software documentation and technical data and rights in such software, documentation, or technical data necessary to satisfy agency needs.

21. All technology licensing is divided between two mutually exclusive categories of deliverables: technical data and computer software. Collectively, these are known as "data rights."

22. Contract data *deliverables* refer to the contractual obligation to deliver to the government technical data or computer software with a predetermined content and format, granting the government with license rights to use such deliverables.

23. 10 U.S.C. § 2320 requires the Secretary of Defense to establish regulations that "define the legitimate interest of the United States and of a contractor . . . in technical data pertaining to an item or process." 10 U.S.C. § 2320 provides the basis for the allocation of rights in noncommercial technical data and the computer software scheme set forth in DFARS 252.227-7013 and 252.227-7014 contract clauses.

24.     DFARS 252.227-7013 defines "Technical data" as "recorded information, regardless of the form or method of the recording, of a scientific or technical nature (including computer software documentation). The term does not include computer software or data incidental to contract administration, such as financial and/or management information."

25.     DFARS 252.227-7014 defines "Computer software" as "computer programs, source code, source code listings, object code listings, design details, algorithms, processes, flow charts, formulae, and related material that would enable the software to be reproduced, recreated, or recompiled. Computer software does not include computer databases or computer software documentation."

26.     *License rights* or *data rights* refer to the authorized or permitted uses of the deliverable or intellectual property in question. The license rights *are not* exclusive rights or delivery rights.

27.     The scope of the government's standard license rights in noncommercial technologies depends upon the relative level of government funding provided for development of the technology.

28.     The government's license rights are often determined by using one of the standard, government-unique license categories defined in the applicable acquisition regulations.

29.     The standard license rights based on the source of funding for the development of technical data or computer software are limited rights, restricted rights, GPR and unlimited rights.

30.     Department of Defense ("DOD") regulation instructs that determining license rights based on funding is done at the lowest practicable level.[2]

---

[2] DFARS 252.227.7013(a)(8)(i); DFARS 252.227.7014(a)(8)(i).

31.     Regardless of who paid for the development of intellectual property, the government obtains license rights *not ownership*.

32.     The government generally obtains an "*unlimited rights*" license in noncommercial technical data, noncommercial computer software and noncommercial computer software documentation delivered under the contract and developed exclusively with government funding.

33.     The government generally obtains a "*government purpose rights*" license in technical data or computer software delivered under the contract and developed using mixed funding (i.e. a combination of private funding and government funding). A government purpose rights license remains in effect for 5 years unless the parties negotiate a different period.

34.     The government generally obtains a "*restricted rights*" license in noncommercial computer software and a "*limited rights*" license in noncommercial technical data delivered under the contract and developed exclusively at private expense.

**B.     How the Government Perfects Its *License* Rights in Technical Data and Computer Software**

35.     In its solicitation, the government specifies data and delivery requirements for its license rights through a Contract Data Requirements List ("CDRL"). *See* DFARS 215.470(b) (requiring use of the CDRL in solicitations when the contract will require delivery of data).

36.     A CDRL comprises either a single DD Form 1423 or a series of DD Forms 1423 containing data requirements and delivery information.

37.     Each CDRL incorporates a Data Item Description ("DID").

38.     A DID uses a standardized form (DD Form 1664). Each DID describes the content, format and intended use of data a contractor is obligated to supply pursuant to a CDRL. DIDs are identified in Block 4 of the CDRL. DIDs are drafted pursuant to MIL-STD-963-C and approved by the Office of Management and Budget.

39.     MIL-STD-963-C directs that each DID describes one deliverable data product. Therefore, a separate DID *shall* be selected or prepared by the government for each contract task that generates more than one deliverable data product. *See* MIL-STD-963-C, § 4.1.

40.     When drafting a CDRL, the contracting agency may reduce, but not increase, the scope of the information the DID requires the contractor to deliver.[3] This process of amending a DID is known as "tailoring." "Tailoring accomplished by modifications, addenda, supplements, or other types of revisions *to exceed or increase the content, intent, scope and deliverable* of the data requirements of an approved data acquisition document are prohibited."[4]

41.     An agency may tailor an approved DID by specifying in Block 16 of the DD Form 1423 those portions of the DID that are or are not applicable to the specific contract.

42.     Upon information and belief, all current government approved DIDs are available through the Department of Defense's website: https://quicksearch.dla.mil/qsSearch.aspx.

## II.     The GPS III and IIIF Programs

### A.     GPS III Systems and Blocks

43.     The GPS system uses a network of satellites known as a "constellation" to transmit position, navigation and timing signals to users on Earth. The GPS system is maintained by the Space Force and has evolved through various iterations since its initial launch. GPS satellite "blocks" refer to the various production generations of GPS satellites. There have been several iterations of the GPS satellite program, including: Block I, Block II, Block IIA, Block IIR, Block IIR-M, Block IIF, Block III and Block IIIF.

---

[3] DoD 5010.12-M, Acquisition Management System and Data Requirements Control List ("AMSDL"), May 1993, incorporating change 1 (Aug. 31, 2018) ("May 1993 AMSDL"), Definitions, § DL 1.1.27; *see also* May 1993 AMSDL, Ch. 3, § C3.2.2 ("Block 16 of the DD Form 1423 may be used to explain how a particular DID applies to the specific acquisition if the original format, content, intent, scope, and deliverables of the [DID] are not exceeded or increased.")
[4] AMSDL C3.2.2. (Emphasis added.)

44.     Advances in technology and new demands on the existing system led to the effort to modernize the GPS system. In 2000, the United States Congress authorized the GPS Block III program ("GPS Block III") to do just that.

45.     Satellites in GPS Block III use additional navigation signals to improve both accuracy and availability for civilian and military users through new ground stations and satellites.

**B.     GPS III Program**

46.     On May 15, 2008, the Government awarded a cost-reimbursement contract to Lockheed Martin to design, develop and manufacture ten satellites or "space vehicles" for GPS Block III ("GPS III").

47.     The GPS III contract, preceded the Contract at issue here. The parties are currently performing under the GPS III contract. Five of ten GPS III satellites have launched and all five are currently operational.

48.     The scope of work under GPS III includes, among other things, the delivery of certain data items, including both hardware and software items.

49.     One of the hardware items the Government sought to acquire was a Navigation Payload Mission Data Unit ("MDU") module. Lockheed Martin subcontracted with L3 Harris to procure the Navigation Payload MDU module.[5]

50.     In addition to the hardware items, GPS III involves three primary flight software

---

[5] The MDU module represents the heart of the GPS Payload. The payload is what performs the functions desired of the satellite. The MDU module combines uploaded navigation data with internally-generated ranging codes and routes to the L-Band Transmitter System, and contains the Frequency Synthesizer Unit. More specifically, L3 Harris' MDU module runs GPS timing and execution. The MDU generates a radio frequency signal, and then transmits a low power signal to an amplifier. The amplifier, in turn, amplifies the signal onto an antenna, which radiates out via an encrypted signal. Thus, the MDU calculates precise position and timing, which then generates information contained in a signal sent to a receiver on the ground. This signal is considered the satellite's "voice" and the clock or timing mechanics is considered the "heartbeat."

items developed by Lockheed Martin, L3 Harris and General Dynamics, respectively.

51.     The Government obtained certain data items under the GPS III contract via incorporation of a CDRL (CDRL A032), which incorporated DID DI-IPSC-81441A, Software Product Specifications (SPS).

**C.     GPS Block IIIF Acquisition**

52.     GPS Block III Follow On ("GPS Block IIIF" or "GPS IIIF") refers to the second set of satellites (space vehicles 11-32) ordered by the Government in Block III.

53.     GPS IIIF involved new and updated technology, including both hardware and software.

54.     The Government started the GPS IIIF acquisition effort in 2016.

55.     The Government employed a two-phase competitive proposal acquisition process for the GPS IIIF satellites. Phase I was a study contract, and Phase II was a contract to produce up to twenty two (22) space vehicles.

**1.     GPS IIIF Acquisition Phase I**

56.     On May 5, 2016, the Government awarded Phase I study contracts to Lockheed Martin, The Boeing Company and Northrop Grumman Corporation.

**2.     GPS IIIF Acquisition Phase II**

57.     The Government commenced Phase II of its acquisition strategy on November 6, 2016, by issuing the first draft RFP for GPS IIIF.

58.     The first draft RFP was for a fixed-price contract for a single company to manufacture all 22 GPS IIIF satellites.

59.     Three additional draft RFPs were issued in 2017. With each draft RFP, the Government provided a question-and-answer session with prospective bidders, including Lockheed Martin.

### 3.   Lockheed Martin's Comments Regarding Data Acquisition Requirements on GPS IIIF Draft RFP

60.     In a December 4, 2017, letter to the Government, Lockheed Martin explained the draft RFP's requirement that all computer software delivered under CDRL A032 be delivered with GPR would improperly allow the Government to share technical data developed exclusively at private expense with that contractor's competitors. Lockheed Martin noted that the language of 10 U.S.C. §2320(a)(2)(H) was clear— if technical data developed exclusively at private expense does not fall within one of the noted exceptions, the contractor would not be required to sell or relinquish its rights.

61.     Specifically, Lockheed Martin stated:

LMC has reviewed the Data Item Descriptions (DIDs) and has determined that for some Contract Data Requirement List (CDRL) items for which the Government has requested Unlimited Rights, LMC will have to deliver technical data developed exclusively at private expense and also does not fall within one of the above exceptions. Unlike its approach for determining Unlimited Rights using the above exceptions, the Government uses its needs as rationale for designating CDRL items as Government Purpose Rights (GPR) without consideration of how development of the technical data was funded. Response item 33 of Reference (d) states that the "Government is requesting the offerors propose a "specially negotiated license" (i.e., Government Purpose Rights)". LMC does not agree with the parenthetical reference equating GPR to Special License Rights. GPR, which converts to Unlimited after five years, could be used for any Government purpose, including sharing our technical data developed exclusively at private expense with competitors (e.g., for a future Space Vehicle competition).

The language of 10 U.S.C. §2320(H) is clear that if technical data developed exclusively at private expense does not fall within one of the noted exceptions, the contractor will not be required to sell or relinquish its rights. Because of the value of this technical data to its business, LMC does not wish to sell or give up its rights in this deliverable technical data and doesn't believe doing so should be a condition of being responsive.

LMC is seeking clarification that if it is required to deliver technical data developed exclusively at private expense, and such technical data does not fall within one of the exceptions, [Lockheed Martin's] proposal evaluation will not be impacted if LMC asserts data rights which are less than the Government's expressed minimum needs.

62.     On December 21, 2017, representatives from Lockheed Martin and the Government held a telephonic meeting to discuss various aspects of the GPS IIIF Final RFP, including the issues pertaining to data rights assertions raised in Lockheed Martin's December 4, 2017 letter. During that call, the Government claimed permitting offerors to assert multiple levels of data rights for each CDRL would create a "Swiss cheese" effect, in that it would limit the Government's ability to utilize the data, and to avoid this, the Government was requiring offerors to assert a single level of data rights for each CDRL.

63.     In response, Lockheed Martin again informed the Government it did not believe the GPS IIIF Final RFP complied with 10 USC § 2320(a)(2)(H).

### 4.     Details of the Final RFP's Data Acquisition Requirements

64.     On February 13, 2018, the Government issued the GPS IIIF Phase II Final RFP ("Final RFP") under solicitation No. FA8807-17-R-0009.

65.     Section B of the Final RFP, Contract Line Item Number ("CLIN") 0011 (Firm Fixed Price) Rights in Data (Tech Data, Computer Software, Docs) in the Final RFP states that "[t]he Contractor shall deliver all rights in data (including technical data, computer software, and computer software documentation) required by Attachment 5 (Rights in Data)."

66.     Section B of the Final RFP, CLIN 0012 (Fixed Price Incentive Firm) (Data & Reports) states "[t]he Contractor shall provide data and reports in accordance with Exhibit A, 'Contract Data Requirements List ("CDRL").'"

67.     Section I of the Final RFP includes various Federal Acquisition Regulation ("FAR") and DFARS clauses, including 252.227-7013 Rights In Technical Data – Non-Commercial Items (FEB 2014), 252.227-7014 Rights In Non-Commercial Computer Software and Non-Commercial Computer Software Documentation (FEB 2014), 252.227-7017 Identification and Assertion of Use, Release, or Disclosure Restrictions (JAN 2011) and

252.227-7019 Validation of Asserted Restrictions – Computer Software (SEP 2016).

68.     Exhibit A of the Final RFP, Section I (CDRL Instructions) states supplemental instructions for CDRL deliverables, including DID tailoring instructions and approval procedures for CDRLs.

69.     Exhibit A of the Final RFP, Section I (CDRL Instructions), Section 6.4 (Submittal Procedures) states "[u]nclassified CDRLs are submitted to the government via TopVue and in accordance with this instruction."

70.     Exhibit A of the Final RFP, Section II (Summary CDRL List—CDRLs A001 through A152) includes DD Form 1423s requiring the delivery of intellectual property content, including CDRL A032 (Software Product Specification (SPS)) and its related DID #DI-IPSC-81441A/T.

71.     Section J of the Final RFP, Attachment 5, Rights in Data (Including Technical Data, Computer Software, and Computer Software Documentation) contains various tables that, when populated by offerors in accordance with Section L-6.3.4.1.6, identifies the type of data rights the offeror proposed to grant the Government for each CDRL.

72.     Section L.6.3.4.1.6 of the Final RFP, Attachment 5, Rights in Data (Including Technical Data, Computer Software, and Computer Software Documentation) contains a requirement by which the Government specified its "minimum needs" for each CDRL – either Unlimited Rights, GPR, or Limited Rights. The data rights assertions for each CDRL in Attachment 5, Table 1 were pre-populated with the Government's minimum asserted rights, and offerors were instructed to insert their proposed data rights assertions and proposed price for each CDRL into each cell of Table 1 for each item of data associated with that item's corresponding cell in Columns 1-3.

13

73.     Pertinent portions of Table 1 are:

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 |
|---|---|---|---|---|
| CDRL NO. | DATA ITEM TITLE (SUBTITLE) | Gov't Asserted RIGHTS CATEGORY | Offeror Proposed RIGHTS CATEGORY | PRICE |
| A027 | Software Design Description (SDD) | Technical Data: Unlimited | Technical Data: | $ |
| | | Computer Software: Government Purpose | Computer Software: | $ |
| A032 | Software Product Specification (SPS) [(Includes Software Version Description) (SVD)] | Technical Data: Unlimited | Technical Data: | $ |
| | | Computer Software: Government Purpose | Computer Software: | $ |

74.     Section L.6.3.4.1.6's requirement that all computer software ordered under the GPS IIIF Contract be delivered with GPR under CDRL A032 was a change from GPS III. Under GPS III, Lockheed Martin delivered computer software to the Government subject to special license rights.

75.     The Government levied this new requirement even though each CDRL could potentially contain multiple technical data and computer software elements. This requirement of only permitting a single data rights assertion for each CDRL had the potential effect of requiring offerors to give up data rights where a single CDRL contained multiple components, each with entitlement to different data rights assertions.

76.     Despite this new requirement, the instructions for completing Table 1 stated:

Where there are valid reasons why an Offeror must develop entirely at private expense or provide previously developed technical data or computer software under this contract the Offeror may not be required, either as a condition of being responsive to this RFP or as a condition for award, to sell or otherwise relinquish to the Government any proprietary right in technical data or computer software developed at private expense, except for the items identified at DFARS 227.7103-5(a)(2) and (a)(4) through (a)(9), DFARS 227.7203-5(a)(3) through (6) and DFARS 227.7102-1(a). See Section L-4.2.4.3.b for details.

14

**5.     The Government Modified the Solicitation to Confirm It Was Not Requiring Offerors to Relinquish Data Rights Developed Exclusively at Private Expense**

77.     On March 14, 2018, the Government issued Amendment 1 to Section M of the RFP, adding the following sentence to Section M.4.2.4.3 Criterion 3: Intellectual Property (b.1):

> "As used in the preceding section, the Government's minimum needs are described in Attachment 5 of the Model Contract. *The Government does not believe those minimum needs require any Offeror to relinquish rights in technical data and computer software developed exclusively at private expense*."

(Emphasis added.)

**6.     Pre-Proposal Communications Confirmed the Government Was Not Requiring Offerors to Relinquish Data Rights Developed Exclusively at Private Expense**

78.     On March 15, 2018, Lockheed Martin submitted questions to be discussed at an in-person pre-proposal conference set to take place in El Segundo, California. In particular, Lockheed Martin stated:

> Section L6.3.4.1.6 subparagraph d 2) now states that "the Offeror shall propose only one type of license rights for all content required to be delivered as part of that CDRL except where Attachment 5 expressly states otherwise for CDRLs A006, A007, A027, A032, A058, A082, A114, and A124."Section M 4.2.4.3 a2) clearly contemplates that an Offeror may wish to assert data rights less than that specified in Attachment 5, Table 1, Column 3 where the Offeror "…developed part of the technical data or computer software to be delivered as part of that CDRL at private expense….". If an Offeror asserts data rights on individual data or software deliverables within a given CDRL which are less than the Unlimited or Government Purpose rights requested by the Government, will the Offeror's proposal be considered noncompliant or will the Offeror receive a weakness or significant weakness. If deemed compliant, how will the Government evaluate an Offeror's proposal with respect to scoring a weakness or significant weakness.
>
> Further, if an offeror is required to assert one type of license right for a CDRL and it is Limited or Restricted rights because the Offeror is entitled to assert such rights for a part or parts of the CDRL, how does that impact other data and software in that CDRL, which do not have the same data rights (i.e., Government Purpose or Unlimited rights)? Would the Government consider the Offeror's assertions to be a false claim?
>
> In Section L subparagraph d 3), an Offeror is directed to insert a price into each cell of column 5 of Table 1 in Attachment 5 for those items of data associated with that

15

item's corresponding cell in columns 1-2. It is not clear from the review of Attachment 5 and Section L what the purpose of this price is. Is the price what an Offeror is offering to the Government to sell the level of data rights established by the Government in column 3? If so, if an Offeror does not wish to sell its data rights and does not provide a price, as a contractor is allowed under 10 U.S.C. 2320(a)(2)(H), will its proposal be deemed non-compliant?

79.     At the pre-proposal conference on March 15, 2018, representatives from Lockheed Martin again raised concerns about the structure of the Government's RFP with respect to delivery of software and data.

80.     During the March 15, 2018, meeting, when confronted with Lockheed Martin's concerns about the RFP's structure, Air Force Space Command legal counsel, James Haag, told Lockheed Martin it had "historically over-provided" content in CDRL deliveries not required by the governing CDRL DID. Mr. Haag directed Lockheed Martin to evaluate each CDRL DID in the GPS IIIF Final RFP and draft its proposal based on delivering *only* the data specifically required in the DID.

81.     On March 30, 2018, Lockheed Martin wrote to the Government confirming its understanding of the pre-proposal conference. In particular, Lockheed Martin confirmed its understanding of the GPS IIIF Final RFP data rights terms as follows:

- Data Rights
  - Insertion of Section L - .4.2.4.3 Criterion 3: Intellectual Property (b.1) was directed toward whether the data or software was a *required deliverable* not toward whether the contractor was justified in asserting data rights because something was privately funded
  - The RFP language was added to ensure that for all tech[nical] data and computer software LM was delivering with lower licenses than specified by the Government[, Lockheed Martin] had validated that [it] w[as] only delivering tech[nical] data, computer software or computer software documentation described in the DID for that CDRL
  - The Government indicated LM ha[d] historically over-provided and encouraged LM to map a specific item asserted with restrictions to a specific paragraph of the DID. If LM was asserting less than the Government[']s asserted rights, LM:

- Should map the asserted item to a CDRL
- Dissect and interpret the DID line by line for what the DID is actually requesting
- Ensure LM was not asserting lower level of license rights for data or computer software as described in 10 USC Section 2320 (a)(2)(C), DFARS 227.7103-5(a)(2) and (a)(4) through (a)(9), and DFARS 227.7203-5(a)(3) through (6) (e.g., form, fit, function data)
- The assertion of multiple types of data rights per CDRL is not allowed except as identified

(Emphasis added.)

82.     The Government never responded to Lockheed Martin's March 30, 2018, letter.

### 7.     Lockheed Martin Followed the Plain Language of the GPS IIIF Final RFP, Government Guidance and DOD Policies to Draft Its Proposal

83.     Based upon (1) the Government's instruction to Lockheed Martin to evaluate each CDRL DID in the RFP and draft its proposal based on delivering *only* the data specifically required in the DID; (2) the Government's statement that Lockheed Martin had "historically over-provided" content in CDRL deliveries not required by the governing CDRL DID; and (3) the Final RFP Amendment that the Government "did not believe its minimum needs as set forth in the RFP would require Lockheed Martin to relinquish rights in technical data and computer software developed exclusively at private expense," Lockheed Martin carefully scrutinized each CDRL and DID for what was actually a required deliverable under the GPS IIIF Contract.

84.     Lockheed Martin closely examined the CDRLs in Exhibit A to GPS IIIF Final RFP and its prior contract deliverables on GPS III to assess what each DID required as a contract deliverable and arrived at an interpretation of each DID that met the expectations of the Government – that Lockheed Martin only deliver what the DID states is a contract deliverable to meet the Government's minimum required data rights.

85.     The plain language of the GPS IIIF Final RFP does not require Lockheed Martin to deliver software executable and source code to the Government with GPR.

17

86.     The CDRL A032 requires delivery of a Software Product Specification (SPS) written in accordance with DID DI-IPSC-81441A/T (hereafter "DID 81441A").

87.     An SPS is a "data product" under the definition of "data product" set forth in MIL-STD-963C 3.12.

88.     Source and executable software code are each a "data product" under the definition of "data product" set forth in MIL-STD-963C 3.12.

89.     DID 81441A defines the SPS as a *narrative document* setting forth the specifications for computer software. Per DID 81441A, an SPS "is the primary software support document for the [software]." Thus, an SPS is a document separate and apart from the software it describes.

90.     DID 81441A states the following as requirements for an SPS:

3. Format. Following are the format requirements.

The specification shall be in contractor format unless otherwise specified on the Contract Data Requirements List (CDRL)(DD 1423). The CDRL should specify whether deliverable data are to be delivered on paper or electronic media; are to be in a given electronic form (such as ASCII, CALS, or compatible with a specified word processor or other support software); may be delivered in developer format rather than in the format specified herein; and may reside in a computer-aided software engineering (CASE) or other automated tool rather than in the form of a traditional document.

. . .

3.1 Executable software. This paragraph shall provide, by reference to enclosed or otherwise provided electronic media, the executable software for the CSCI, including any batch files, command files, data files, or other software files needed to install and operate the software on its target computer(s). In order for a body of software to be considered a valid copy of the CSCI's executable software, it must be shown to match these files exactly.

3.2 Source files. This paragraph shall provide, by reference to enclosed or otherwise provided electronic media, the source files for the CSCI, including any batch files, command files, data files, or other files needed to regenerate the executable software for the CSCI. In order for a body of software to be considered a valid copy of the CSCI's source files, it must be shown to match these files exactly.

. . .

5.1 "As built" software design. This paragraph shall <u>contain, or reference an</u> <u>appendix or other deliverable document that contains</u>, information describing the design of the "as built" CSCI. The information shall be the same as that required in a Software Design Description (SDD), Interface Design Description (IDD), and Database Design Description (DBDD), as applicable. If these documents or their equivalents <u>are to be delivered</u> for the "as built" CSCI, this paragraph shall reference them. If not, the information shall be provided in this document. Information provided in the headers, comments, and code of the source code listings may be referenced and need not be repeated in this section. If the SDD, IDD, or DBDD is included in an appendix, the paragraph numbers and page numbers need not be changed.

(Emphasis added.)

91.     DID 81441A Section 3 describes the format for the written SPS as a "deliverable."

92.     Both Section 3.1 and 3.2 of DID 81441A describe requirements for "paragraphs" in the *written* SPS and tell the contractor to provide a reference to "*otherwise provided*" software. (Emphasis added.)

93.     Nothing in Sections 3.1 and 3.2 create software delivery obligations for the contractor, and the "otherwise provided" language contemplates a method for sharing the software that is different than "delivering" it.

94.     Section 5.1 describes the "as built" software design as being contained in an appendix or other "deliverable document."

95.     DI-IPSC-81441A  describes a purpose of "[t]he SPS can be used *to order* the executable software and/or source files for a CSCI and is the primary software support document for the CSCI." (Emphasis added.)

96.     DI-IPSC-81441A does not create a mechanism to order software items. Rather, DI-IPSC-81441A *identifies* software items the Government may wish to order in the future.

97.     If DI-IPSC-81441A requires contractors to deliver "executable software and/or source files" then there would be no reason for DI-IPSC-81441A to state the SPS can be used in the future as a basis for *ordering* such software.

98.     Although the Government tailored the language describing the purpose of the SPS in the DID, the tailoring could not increase the scope of the required deliverables under the CDRL.[6] By regulation, such tailoring can only *reduce*, not increase the scope of information a DID requires the contractor to deliver.[7]

99.     Accordingly, DID 81441A in CDRL A032 only requires Lockheed Martin to deliver an SPS and make software executable and source code available.

100.    Lockheed Martin did not ignore Sections 3.1 and 3.2 of DID 81441A. Properly understood, those paragraphs of the SPS provide a reference to the software executable and source code which are *available* for the Government to review and confirm that the software and source files match the specifications set forth in the SPS. Lockheed Martin's interpretation gives

---

[6] Block 16 of CDRL A032 states:

BLK 4: Tailor DI-IPSC-81441A as follows:

1) Replace all references to "computer software configuration item" and "CSCI" with "Software Item" and "SI" respectively.

2) Replace the first two paragraphs in the "Use, Relationship section with the following two paragraphs:

"One or more Software Product Specifications shall be prepared for all software items in the following categories of software (including the software portion of firmware): Space Vehicle flight software and other software used in satisfying, verifying or validating requirements or used in performing supporting operations or sustainment (e.g., training, modeling, simulation, analysis, database support, automatic test equipment, maintenance).

Include, as an appendix to the SPS, a software version description per DI-IPSC-81442A, and replace all references to "computer software configuration item" with "software item"."

3) At the end of paragraph, "3.2. Source files", add "The source files shall include all noncommercial computer software, and all commercial item computer software (excluding Commercially Available Off-the-Shelf (COTS) software)."

[7] *See* DoD 5010.12-M, AMSDL, *supra.*

effect to all of DID 81441A.

### 8.    Lockheed Martin Submitted Its Proposal Relying on the Government's Statement to Narrowly Construe the Data Deliverables under the Contract

101.    Lockheed Martin submitted its proposal in response to the GPS IIIF Final RFP on April 16, 2018.[8]

#### (a)    Lockheed Martin's Proposal Identified Software Developed at Private Expense and Did Not Give GPR to that Software

102.    Lockheed Martin's proposal included the On-Board Computer ("OBC") flight software, which runs flight software that provides altitude, power and thermal control for the space vehicle.  The proposal stated the OBC flight software was developed by Lockheed Martin.

103.    Lockheed Martin's proposal also identified its first-tier subcontractors, including L3 Harris who would continue to develop and deliver a fully digital Navigation Payload MDU for the program, and General Dynamics who would develop Thin Communications Unit ("TCU") flight software, which provides the communications interface between the GPS IIIF spacecraft bus, network communications and navigation elements.

104.    Lockheed Martin's proposal highlighted several hundred million dollars of private "investment," including a significant investment by L3 Harris ($29M) in developing the GPS IIIF digital MDU design prior to GPS IIIF contract award.

105.    Lockheed Martin included a completed Table 1 in Attachment 5 to its proposal which populated Columns 4 and 5 associated with each CDRL.

106.    With respect to CDRL A032, Lockheed Martin inserted "Government Purpose Rights" as the type of intellectual property license it proposed to grant the Government to the portion of CDRL A032 that required the delivery of "Computer Software" and "Unlimited

---

[8] Of the three participants from Phase I, only Lockheed Martin submitted a proposal in Phase II.

Rights" as the type of intellectual property license it proposed to grant the Government to the

portion of CDRL A032 that required the delivery of "Technical Data":

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 |
|---|---|---|---|---|
| CDRL NO. | DATA ITEM TITLE (SUBTITLE) | Gov't Asserted RIGHTS CATEGORY | Offeror Proposed RIGHTS CATEGORY | PRICE |
| A027 | Software Design Description (SDD) | Technical Data: Unlimited | Technical Data: Unlimited | $0 |
| | | Computer Software: Government Purpose | Computer Software: Government Purpose | $0 |
| A032 | Software Product Specification (SPS) [(Includes Software Version Description) (SVD)] | Technical Data: Unlimited | Technical Data: Unlimited | $0 |
| | | Computer Software: Government Purpose | Computer Software: Government Purpose | $0 |

107.    As required by the RFP, the proposal also included Lockheed Martin's Model

Contract.

108.    Lockheed Martin's Model Contract contained a number of data rights clauses,

including Section K DFARS 252.227-7017 (Identification and Assertion of Use, Release, or

Disclosure Restrictions) (JAN 2011). Lockheed Martin asserted specific data rights for different

technology items – both hardware and software – on behalf of itself as well as its First Tier

Subcontractors.

109.    In relevant part, the Model Contract included with the proposal stated the

following:

| Technical Data or Computer Software to be Furnished with Restrictions* | Basis for Assertion** | Asserted Rights Category*** | Name of Person / Entity Asserting Rights**** |
|---|---|---|---|
| ERIU; LTWTA dual EPC configuration; Attitude Control Subsystem (ACS) architecture/design using the STARMU and related software modules; SV EGSE ACE rack; Propulsion Subsystem/ACS - Eight 5 lb thruster configuration and firing command algorithms; (Li-Ion based) Power Management software design and code; A2100 Structure subsystem, subsystem interfaces and component designs, AI&T processes and procedures; Antenna deployment hinges, gimbals, shear ties, booms; Solar Array deployment hinges, shear ties, | Developed at private expense | Limited / Restricted Rights | Lockheed Martin |

| Technical Data or Computer Software to be Furnished with Restrictions* | Basis for Assertion** | Asserted Rights Category*** | Name of Person / Entity Asserting Rights**** |
|---|---|---|---|
| substrates, booms; Structural / thermal joints, and adapter to ELV; Thermal subsystem architecture, designs, analysis methods and tools, A2100- specific design and test adaptations of supplier products and related software modules; TT&C subsystem architecture, analysis methods and tools, design, A2100-specific design and test adaptations of supplier products and related software modules; UDU (including internal modules) designs, processes and test methods; Power subsystem architecture, analysis methods and tools, design, A2100-specific design and test adaptations of supplier products; Scalable Power Regulation Unit (SPRU) design, processes and test methods; 70V-to-28V Converter with Converter Controller, and Payload / Switch Module - design, processes and test methods; Solar Array design, analyses, processes, verification, and integration and test methods; High Power 4-element M-code Tx antenna, including Feeds, Low PIM interfaces, Thermal / ESD bleed coating; L-band Dual-tapered helical antenna, including low PIM interfaces and Thermal / ESD bleed coating; L3 and L4 dual-tapered helical antennas, including low PIM interfaces and Thermal / ESD bleed coating; S-band uplink dual-tapered helical antenna, including low PIM interfaces and Thermal / ESD bleed coating; High Power L-band Helix Tx Antenna Design; Low PIM Antenna Choke Interface Design; Crossed-dipole Omni antenna | | | |
| Tech Data related to FEI technology design, test protocols and manufacturing processes associated with the following:<br><br>1. Atomic clock architecture<br>2. Quartz crystals, crystal oscillators, Ceramic Resonator Oscillators (CRO), Dielectric Resonator Oscillators (DRO)<br>3. Rubidium frequency standards<br>4. Control loops for quartz and atomic clocks, including precision temperature control<br>5. RF filters<br>6. DC/DC converters: | Developed at private expense | Limited Rights | Frequency Electronics, Inc. (FEI) |
| Starlight Architecture Includes hardware and software architecture for StarLight, StarBridge, StarPort, and StarRouter modules (also referred to as SPP, Space Products Platform, Software Programmable Platform) | Developed at private expense (IRAD #71031) | Limited / Restricted Rights | General Dynamics Mission Systems |
| Coldfire Microprocessor | Developed by Motorola SPS for commercial applications | Limited / Restricted Rights | General Dynamics Mission Systems |
| Space Router (Also referred to as GPP2000, StarRouter, Router in the sky) | Developed at private expense (IRAD #71145) | Limited / Restricted Rights | General Dynamics Mission Systems |
| Cross Link Waveform | Developed at private expense (IRAD #71222) | Restricted Rights | General Dynamics Mission Systems |
| ISS Common STE SW Architecture | Developed at private expense | Restricted Rights | General Dynamics Mission Systems |
| OV-5 Bus Controller SW | Developed at private expense (IRAD 71182 and IRAD 71222) | Limited / Restricted Rights | General Dynamics Mission Systems |

23

| Technical Data or Computer Software to be Furnished with Restrictions* | Basis for Assertion** | Asserted Rights Category*** | Name of Person / Entity Asserting Rights**** |
|---|---|---|---|
| Hardware design and analysis technical data for the BDM, SAM, SDM, SRF, and URF modules of the enhanced SGLS-USB Transponder | Developed at private expense | Limited Rights | General Dynamics Mission Systems |
| Integrated Mission Data Unit (MDU) | Developed with mixed funding | Government Purpose Rights | Harris Corporation |
| MDU Digital Waveform Generator (DWG) Module | Developed at private expense | Limited Rights | Harris Corporation |
| MDU Frequency Synthesizer Module | Developed at private expense | Limited Rights | Harris Corporation |
| MDU Time Keeping System Module | Developed at private expense | Limited Rights | Harris Corporation |
| MDU Flight Software (Excludes Advanced Phase Meter with Integrity Monitoring (Time Keeping System (TKS)) Software) | Developed with mixed funding | Government Purpose Rights | Harris Corporation |
| Advanced Phase Meter with Integrity Monitoring (Time Keeping System (TKS)) Hardware | Developed at private expense | Limited Rights | Harris Corporation |
| Advanced Phase Meter with Integrity Monitoring (Time Keeping System (TKS)) Software | Developed at private expense | Restricted Rights | Harris Corporation |
| Advanced Phase Meter with Integrity Monitoring (Time Keeping System (TKS)) Firmware | Developed at private expense | Limited Rights | Harris Corporation |
| RAD750 Design Information Technical Data | Developed at private expense | Limited Rights | Harris Corporation / BAE Systems, Inc. |
| VHDL Library for FPGA Development Technical Data | Developed at private expense | Limited Rights | Harris Corporation / BAE Systems, Inc. |
| Visual Studio Computer Software | Developed at private expense | Restricted Rights | Harris Corporation / BAE Systems, Inc. / Microsoft |
| NI – VISA Computer Software | Developed at private expense | Restricted Rights | Harris Corporation / National Instruments |
| Lab Windows CVI Computer Software | Developed at private expense | Restricted Rights | Harris Corporation / National Instruments |
| Quartz Crystal Oscillator(s) Electronic Schematics and Design of Oven Insulation and Suspension | Developed at private expense | Limited Rights | Harris Corporation / Microsemi Corporation |
| All BOMs, Schematics, Drawings and Other Technical Information to the Extent Such Data Represents VPT Standard Commercial Products | Developed at private expense | Limited Rights | Harris Corporation / VPT, Inc. |
| All BOMs, Schematics, Drawings and Other Technical Information to the Extent Such Data Represents modifications to VPT Standard Products Made Specifically to Meet GPSIII Requirements and Specifications | Developed with mixed funding | Government Purpose Rights | Harris Corporation / VPT, Inc. |
| Technical Data related to commercial Reaction Wheel Assembly (RWA), On-Board Computer (OBC), and Stellar Attitude and Rate Measurement Unit (STARMU) | Developed at private expense | Limited Rights | Honeywell |
| Technical data related to Solar Array Drive Assembly (SADA) components / slip ring | Developed at private expense | Limited Rights | RUAG |
| All technical design and performance data related to gimbal technology | Developed at private expense | Limited Rights | Sierra Nevada Corporation |
| Core Material Composition, Winding Procedure, Heat Treat Procedure, Assembly Drawings (High Level Interface and MTR Assembly Drawings) related to Magnetic Torque Rods (MTR) technology | Developed at private expense | Limited Rights | Goodrich Corporation, A UTC Aerospace Systems Company, ISR Danbury |

**(b)      Lockheed Martin's Proposal Disclosed How It Would Provide Software Consistent with the Plain Language of the Final RFP**

110.    Because the GPS IIIF program would produce enormous amounts of technical

data, only a small subset of which would be delivered to the Government, Lockheed Martin established two separate electronic databases for Government access: one for delivered technical data and another for non-delivered (but available) technical data and software.

111.    Establishing two databases, one for deliverables and one for non-deliverable technical data that is made available and can be delivered should the government order such technical data, is consistent with the plain language of the CDRLs and DIDs. As stated above, Sections 3.1 and 3.2 of DID 81141A require Lockheed Martin to provide in a paragraph of the written SPS, "by reference to enclosed or *otherwise provided* electronic media," both the executable software and source files. (Emphasis added.)

112.    Thus, in Attachment 5, Appendix B (IDE Repository) of the proposal, Lockheed Martin proposed to establish and maintain an Integrated Data Environment Repository ("IDE-R") during contract performance.

113.    Attachment 5, Appendix B, Section 1 of the proposal states that the purpose of the IDE-R is to describe the structured electronic collaborative environment that Lockheed Martin would develop and maintain, while permitting Lockheed Martin, Lockheed Martin subcontractors, and Government personnel to cost-effectively and securely create, manipulate, deposit, upload, retrieve/download and exchange all data created or utilized by those personnel during the performance of the GPS IIIF Contract.

114.    Attachment 5, Appendix B, Section 1 of the proposal also states that the IDE-R is one subdivision of the GPS IIIF Collaborative Environment ("GCEF"). Lockheed Martin's proposal further states that the IDE-R will be hosted in SharePoint within the GCEF and that the GCEF is a collection of tools and data repositories hosted in multiple Lockheed Martin environments. The GCEF gives the Government access to GPS IIIF program information that

goes beyond what is delivered to the Government under the Contract.

115. Attachment 5, Appendix B, Section 3(d) of the proposal identifies the types of data that will reside in the IDE-R subdivision of the GCEF enclave, examples of which include (1) Data listed on the Data Accession List (DAL), A039; (2) Contract Data Requirements List (CDRL) deliverables, Exhibit A; (3) Failure Reporting, Analysis, and Corrective Action System (FRACAS) data; (4) Engineering model files; (5) Risk management database; (6) and Special Studies database.

116. Attachment 5, Appendix B, Section 3(d) of the proposal ensures only data already defined as "deliverable" under Exhibit A of the Final RFP, data first produced in the performance of the contract under the SOW, or data required by the SOW to be put in the IDE-R would be uploaded to the IDE-R.

117. Attachment 5, Appendix B, Section 3(d) of the proposal also states "[i]f the Government wishes to have access to other types of information (e.g., draft/work-in-progress data generated in performance of this contract and data utilized in the performance of this contract that is not a CDRL listed in Exhibit A) [Lockheed Martin] will assess providing access to such information on a case-by-case basis either through the IDE-R or another method (e.g., GCEF or contracts letter)."

### 9. The Government Awarded Lockheed Martin the GPS IIIF Contract without Questioning the Proposal

118. On September 14, 2018, the Government awarded Lockheed Martin the GPS IIIF Contract. The RFP and Lockheed Martin's proposal were incorporated fully into the resulting GPS IIIF Contract.

119. After receiving Lockheed Martin's GPS IIIF proposal, the Government did not establish a competitive range or conduct discussions regarding the content of that proposal.

120.     At no time prior to award did the Government ask Lockheed Martin why it asserted Restricted Rights in some of the software the Government now claims must be delivered with GPR.

121.     The Government accepted Lockheed Martin's proposal identifying separate databases, one for contract deliverables and one for non-deliverable technical data that is made available (i.e., *provided*) to the Government. The Government has been operating within these two environments since contract award without objection.

### 10.     The Parties Bilaterally Approved a Modification Consistent with Lockheed Martin's Interpretation of the Contract

122.     On January 17, 2019, the parties incorporated by reference into the GPS IIIF Contract Lockheed Martin's revised Section K DFARS 252.227-7017 representation via bilateral Modification P00009. This representation served to map the associated CDRL to the Technical Data or Computer Software elements to be delivered with an associated level of data rights.

123.     With respect to the MDU Flight Software, the entry stated:

| Technical Data or Computer Software to be Furnished with Restrictions* | Basis for Assertion** | Asserted Rights Category*** | Name of Person/Entity Asserting Rights **** | Associated CDRL |
|---|---|---|---|---|
| MDU Flight Software (Excludes Advanced Phase Meter with Integrity Monitoring (Time Keeping System (TKS) Software) | Developed with mixed funding | Government Purpose Rights | Harris Corporation | A027, A032 |

124.     This modification expressly excluded providing the Advanced Phase Meter with Integrity Monitoring (Time Keeping System (TKS) Software) with GPR.

125.     The modification did not alter Lockheed Martin's Model Contract, which disclosed that the TKS software was developed by L3 Harris at private expense.

27

126.     The modification did not "map" *all* of the technology items identified in Lockheed Martin's DFARS 252.227-7017 assertions to a particular CDRL. The Government did not object to this prior to awarding the contract to Lockheed Martin.

> **D.     Three Years after Contract Award, the Government Asserted the Flight Software Executable and Source Code Are Deliverables**

127.     On April 26, 2021, Lockheed Martin notified the Government by email that "the submission approach for [GPS] IIIF is different than GPS III due to the fixed-price nature of the contract," and whenever CDRL A032 would be ready for delivery, any source files would be made available to the Government in compliance with DID 3.2 (and supporting/reference material would be available at a specified hyperlink).

128.     On April 27, 2021, the Contracting Officer emailed Lockheed Martin inquiring whether (1) Lockheed Martin was stating that source code was not a CDRL deliverable, and (2) supporting and reference material would only be made available to the Government.

129.     Shortly thereafter, the Contracting Officer sent a follow-up email to Lockheed Martin inquiring what she meant when she stated Lockheed Martin would only make "available" the source code by asking whether the Government can download that software—or "does it mean look but don't touch?"

130.     On April 28, 2021, Lockheed Martin responded that, for GPS IIIF CDRLs and respective DIDs where the "by reference" language is included, Lockheed Martin's general approach is to (1) deliver the formal deliverable marked with appropriate data rights (Limited, GPR, Unlimited) in compliance with contractual requirements and (2) provide supporting, non-deliverable information through the GCEF which will be marked with proprietary markings, if applicable.

131.     Lockheed Martin also explained that supporting information provided to the

28

Government via the GCEF SharePoint can be viewed, downloaded, used, etc. within the bounds of any proprietary marking.

132.     On June 23, 2021, the Contracting Officer sent a letter to Lockheed Martin stating "[i]t is the Government's position that [Lockheed Martin] is required to deliver all technical data and computer software described in CDRL A032, including all Flight Software source and executable code—including Bus Flight Software and Navigation Flight Software (*e.g.,* MDU Flight Software)—with Government Purpose Rights (GPR), and all technical data described in that CDRL with Unlimited Rights (UR)."

133.     On July 29, 2021, Lockheed Martin replied to the Government's letter:

    a.     explaining how the contract requirements changed from GPS III to GPS IIIF;

    b.     confirming it understood during the proposal phase that the Government did not intend its RFP to violate 10 U.S.C. § 2320(a)(2)(H) by requiring the Contractor to relinquish data rights;

    c.     explaining Lockheed Martin could not have simply asserted Limited or Restricted Rights in the entire CDRL as this would have been more restrictive as to portions of the deliverable for which the Government is entitled to broader rights;

    d.     confirming it construed the CDRLs narrowly to meet the RFP requirements by making the executable software and source code available through the GCE-F rather than delivering those files through the IDE-R;

    e.     reminding the Government that Lockheed Martin discussed this issue with the Government at the March 15, 2018 Pre-Proposal Conference and memorialized its understanding of the conference via its March 30, 2018 letter;

    f.     explaining Lockheed Martin believed the Government understood prior to contract award that such deliverables would reference proprietary data to be provided only via a separate database allowing the Government to confirm the analysis against the design;

    g.     reminding the Government that this approach was encouraged by the Government, who acknowledged Lockheed Martin had historically over-provided intellectual property; and

h.      reminding the Government that it encouraged Lockheed Martin to map a specific item asserted with restrictions to a specific paragraph of the DIDs.

**E.      Lockheed Martin Requested and the Government Denied Modification to the GPS IIIF Contract**

134.    On December 7, 2021, Lockheed Martin sent a follow-up response to the Government stating Lockheed Martin recently learned that the Government's requirement under CDRL A032 was to *deliver* – not *provide* – flight software executable and source code.

135.    Based upon this new information, and only under the assumption that the Government's interpretation of the Contract was correct, Lockheed Martin made a post-award assertion under DFARS 252.227-7014(e)(3), which permits additional assertions to be made post award based on new information or inadvertent omissions.

136.    In doing so, Lockheed Martin sought to make additional assertions pertaining to computer software based upon technology items developed exclusively at private expense, in which the Government would only be entitled to receive a Restricted Rights license.

137.    Lockheed Martin attached its new GPS IIIF data rights assertion for software and source code delivery under CDRL A032 to its request. Specifically, Lockheed Martin's proposed new assertions stated the Government would only acquire Restricted Rights to: the Advanced Phase Meter with integrity Monitoring (Time Keeping System (TKS) Software and Source Code; the Advanced Phase Meter with integrity Monitoring (Time Keeping System (TKS)) Firmware; the MDU Digital Waveform Generator (DWG) Software and Source Code; the MDU TKS Software and Source Code; the MDU Frequency Synthesizer Software and Source Code; and the TCU Flight Software (TCU FSW) Version 2.2.1A Source Code.

138.    Lockheed Martin also attached its proposed redline changes to CDRL A032. In particular, Lockheed Martin proposed to replace the word "provide" with the word "deliver" in paragraphs 3.1 and 3.2 of DID 81441A.

30

139.    Lockheed Martin respectfully requested that those assertions be added to Attachment 5 of the GPS IIIF Contract and proposed two options: (1) the Government issue a request for proposals requesting delivery of source code associated with CDRL A032 with GPR or (2) the Government execute a specifically negotiated license to modify the standard license rights granted to the Government with each asserting party.

140.    The Government disregarded Lockheed Martin's assertions under DFARS 252.227-7014(e)(3) and failed to follow the required validation procedures for such assertions set forth in DFARS 252.227-7019.

### F.    The Government Issued a COFD Directing Lockheed Martin to Deliver the Flight Software Executable and Source Code with GPR

141.    On December 24, 2021, the Contracting Officer issued a COFD stating he had, *inter alia,* made the following findings and determinations:

   a.    The Government is entitled under the terms and conditions of that contract to delivery of all GPS IIIF Space Vehicle Bus and Navigation Payload Flight noncommercial and commercial technical data and computer software—including both source and executable code (including OBC/TCU/MDU Flight Software source code) but excluding Commercially Available Off-the Shelf (COTS) source code—under CDRL A032.

   b.    The contract requires [Lockheed Martin] to provide that intellectual property (IP) content via TopVue and the Integrated Data Environment-Repository (IDE-R) subdivision of the GPS IIIF Collaborative Environment (GCEF) enclave by the dates specified in BLKs 12-13 of the DD Form 1423 for that CDRL.

   c.    The Government expects all technical data and computer software delivered under CDRL A032 will be affixed with appropriate restrictive markings consistent with Tables 1 and 2 of Attachment 5 of contract FA8807-18-C-0009.

   d.    Lockheed Martin has failed to demonstrate that "new information" exists as that term is used in DFARS 252.227-7014(e)(3).

(*See* Exhibit 1.)

142.   The Government based its findings and conclusions, in part, on outdated and superseded regulations. (*Id.*, e.g., references to the Armed Services Procurement Regulation which expired in the late 1970s).

143.   The Government acknowledged the GPS IIIF Contract was subject to multiple meanings and therefore was ambiguous because the COFD:

a.     set forth multiple potential interpretations of the word "deliver" based on its use and the use of synonyms in the DFARS;

b.     ignored or wrote out the phrase "otherwise provide" from the GPSIII Contract; and

c.     improperly characterized pre-award negotiations and post award practices to interpret the GPS IIIF Contract.

144.   The COFD also incorrectly claimed that Lockheed Martin ignored the plain language of the Final RFP.

**G.     The Government Rejected Lockheed Martin's OBC Software Submission**

145.   On September 15, 2022, Lockheed Martin submitted its CDRL A032 OBC Flight Software (FSW) Software Product Specification via TopVue and the IDE-R subdivision of the GCEF enclave with Unlimited rights. The SPS referenced to the source code on the GCEF SharePoint with a marking of Lockheed Martin Proprietary Information.

146.   On October 27, 2022, the Government rejected this submission on the basis that it contained non-conforming markings that did not comply with Section J of the Final RFP, Attachment 5, Rights in Data.

## COUNTS

147.   Lockheed Martin pleads the following counts in the alternative:

## COUNT I

### Declaratory Judgment - Lockheed Martin's Interpretation of the Contract Is Correct

148.    Lockheed Martin repeats, re-alleges and incorporates by reference each allegation set forth above, as though fully set forth herein.

149.    The Government has acted in direct contravention to the terms of the Contract; the Contracting Officer's interpretation of CDRL A032 dramatically expands the scope of the Contract by demanding delivery of all GPS IIIF Space Vehicle Bus and Navigation Payload Flight noncommercial and commercial technical data and computer software—including both source and executable code (including OBC/TCU/MDU Flight Software source code) but excluding Commercially Available Off-the Shelf (COTS) source code—under CDRL A032. The Government's interpretation is unreasonable.

150.    Based upon (1) the Government's direction to evaluate each CDRL DID in the RFP and draft its proposal based on delivering *only* the data specifically required in the DID; (2) the Government's statement that Lockheed Martin had "historically over-provided" its intellectual property; and (3) the Final RFP Amendment that the Government "did not believe its minimum needs as set forth in the RFP would require Lockheed Martin to relinquish rights in technical data and computer software developed exclusively at private expense," Lockheed Martin carefully scrutinized each DID for what was actually a required deliverable under the GPS IIIF Contract.

151.    Lockheed Martin closely examined the CDRLs in the GPS IIIF Final RFP and its prior contract deliverables on GPS III in assessing what each DID required as a contract deliverable, and arrived at an interpretation of each DID that met the expectations of the Government – that Lockheed Martin only deliver what that DID establishes as a contract deliverable in order to meet the Government's minimum required data rights.

152.     GPS IIIF CDRL A032 requires delivery of an SPS written in accordance with DID 81441A. DID 81441A defines the SPS as a narrative document setting forth the specifications for computer software. Per DID 81441A, an SPS "is the primary software support document for the [software]." An SPS is a document separate and apart from the software it describes. The written SPS is a contract deliverable.

153.     Both Section 3.1 and 3.2 of DID 81441A describe requirements for "paragraphs" in the written SPS. Sections 3.1 and 3.2 tell the contractor to provide a reference to "otherwise provided" software. Sections 3.1 and 3.2 do not create software delivery obligations for the contractor.

154.     DI-IPSC-81441A describes a purpose of "[t]he SPS can be used *to order* the executable software and/or source files for a CSCI and is the primary software support document for the CSCI." (Emphasis added.) The Government tailored the language describing the purpose of the SPS out of the DID, but doing so did not increase the scope of the required deliverables under the CDRL. In other words, removal of the prospective "to order" language did not make executable software and source code a contract deliverable where it would not have been under the original DI-IPSC-81441A language.

155.     In accordance with Lockheed Martin's interpretation of the Contract, Lockheed Martin established, and the Government accepted, separate databases, one for contract deliverables and one for non-deliverable technical data that is made available (i.e., *provided*) to the Government.

156.     In demanding that Lockheed Martin deliver the flight software executable and source code, the Government ignores the plain meaning of the Contract.

157.     This Court may grant the relief it considers proper, including declaratory and

injunctive relief, in any nonmonetary dispute on which a decision of the Contracting Officer has

been issued under the CDA. 28 U.S.C. § 1491(a)(2).

158.    Lockheed Martin, therefore, is entitled to a declaration that: Lockheed Martin's

interpretation of the Contract is correct; the Government failed to comply with the terms of the

Contract; and, consequentially, the COFD is void and CDRL A032 of the Contract does not

require Lockheed Martin to deliver flight software executable and source code with GPR.

### COUNT II

**Declaratory Judgment - Under the Doctrine of *Contra Proferentem*, Lockheed Martin Is
Not Required to Deliver Flight Software Executable and Source Code under CDRL A032**

159.    Lockheed Martin repeats, re-alleges and incorporates by reference each allegation

set forth above, as though fully set forth herein.

160.    As stated above, Lockheed Martin adopted a reasonable interpretation of the

Contract. CDRL A032 did not require delivery of flight software executable and source code.

161.    If, however, this Court finds that the Government's interpretation was reasonable,

this Court should also find the Contract language regarding what Lockheed Martin agreed to

deliver was ambiguous, and construe the Contract against the Government.

162.    The Final RFP requirements and specifications were prepared and issued by the

Government. Those requirements and specifications were incorporated into the GPS IIIF

Contract awarded to Lockheed Martin.

163.    The language in the Final RFP was susceptible to more than one interpretation.

Both Section 3.1 and 3.2 of DID 81441A describe requirements for "paragraphs" in the written

SPS. Sections 3.1 and 3.2 tell the contractor to provide a reference to "otherwise provided"

software. Sections 3.1 and 3.2 do not create software delivery obligations for the contractor.

164.    DI-IPSC-81441A describes a purpose of "[t]he SPS can be used *to order* the

35

executable software and/or source files for a CSCI and is the primary software support document

for the CSCI." (Emphasis added.) Although the Government tailored the language providing it

with the prospective ability "to order" the executable software and source code under CDRL

A032, such tailoring did not increase the scope of the required deliverables under the CDRL. In

other words, removal of the prospective "to order" language did not make executable software

and source code contract deliverables where they would not have been under the original DI-

IPSC-81441A language.

165.    Lockheed Martin actually and reasonably construed the requirements and

specifications in accordance with one susceptible meaning. Based on the plain reading of DID

81441A, Lockheed Martin agreed to *deliver* the SPS through the IDE-R, and to *provide* flight

software executable and source code through another method without any license rights. In

accordance with Lockheed Martin's interpretation of the Contract, it established separate

databases, one for contract deliverables and one for non-deliverable technical data and computer

software that is made available to the Government.

166.    Lockheed Martin had no reason to believe its interpretation was incorrect,

especially considering the Contract expressly required delivery of an SPS document and

"otherwise provide[]" software. The Government's pre-proposal conduct supported Lockheed

Martin's interpretation – the Government instructed Lockheed Martin to evaluate each CDRL

DID in the RFP and draft its proposal based on delivering only the data specifically required in

the DID; the Government informed Lockheed Martin it "historically over-provided" its

intellectual property; and the Government amended the Final RFP to state it "did not believe its

minimum needs as set forth in the RFP would require Lockheed Martin to relinquish rights in

technical data and computer software developed exclusively at private expense."

167.    The Government made no effort to inform Lockheed Martin of its contrary interpretation until after contract award, which, if adopted, would force Lockheed Martin to surrender flight software executable and source code funded exclusively at private expense.

168.    This Court may grant the relief it considers proper, including declaratory and injunctive relief, in any nonmonetary dispute on which a decision of the Contracting Officer has been issued under the CDA. 28 U.S.C. § 1491(a)(2).

169.    Lockheed Martin, therefore, is entitled to a declaration that under the doctrine of *contra proferentum*, Lockheed Martin is not required to deliver flight software executable and source code even if the Government's interpretation is correct and, consequentially, the COFD is void.

## COUNT III

### Declaratory Judgment - the Government's Interpretation Violates 10 U.S.C. § 2320(a)(2)(H) and DFARS 227.7203-1(c)

170.    Lockheed Martin repeats, re-alleges and incorporates by reference each allegation set forth above, as though fully set forth herein.

171.    10 U.S.C. § 2320(a)(2)(H) prohibits the Government from requiring a contractor or subcontractor, as a condition of being responsive to a solicitation or as a condition for the award of a contract, *to sell or relinquish* to the United States any rights in technical data, except for in very narrow exceptions, none of which apply here.[9]

172.    DFARS 227.7203-1(c) states that offerors shall not be required, either as a condition of being responsive to a solicitation or as a condition for award, *to sell or otherwise* relinquish to the Government any rights in computer software developed exclusively at private expense except for except for in certain exceptions, none of which apply here.

---

[9] 10 U.S.C. § 2320(a)(2)(H) is extended to computer software via DFARS 227.7203-1(c) and (d).

173.    Lockheed Martin's correct interpretation presumes that the Government conducted its procurement in accordance with the law and that neither the Contract nor the Government requires the awardee or its subcontractors to sell or relinquish its intellectual property to the Government.

174.    In the COFD, the Government argues 10 U.S.C. § 2320(a)(2)(H) only applies to intellectual property rights, not to intellectual property *content*. Essentially, the Government argues it can require delivery of computer software without violating 10 U.S.C. § 2320(a)(2)(H), because the law only protects contractors from being forced to sell or relinquish intellectual property rights, and does not preclude the Government from seizing intellectual property content outright.

175.    If the Government's interpretation is correct, the Government can release Lockheed Martin's or its subcontractors' intellectual property to their competitors for certain purposes. And, after a five-year period, even those minimal protections vanish and the Government has unlimited rights to do with that computer software what it pleases. DFARS 252.227-7014(b)(2)(ii). In other words, delivery of computer software with GPR is no different than relinquishing virtually all intellectual property protections.

176.    The COFD asserts Lockheed Martin cannot negotiate more restrictive rights for any intellectual property content that the Government now deems a deliverable.

177.    The Government's interpretation of CDRL A032 is unreasonable and contradicts 10 U.S.C. § 2320(a)(2)(H) and DFARS 227.7203-1(c).

178.    This Court may grant the relief it considers proper, including declaratory and injunctive relief, in any nonmonetary dispute on which a decision of the contracting officer has been issued under the CDA. 28 U.S.C. § 1491(a)(2).

179.     Lockheed Martin, therefore, is entitled to a declaration that the Contract interpretation put forth by the Government violates the statutory protections afforded to contractors under 10 U.S.C. § 2320(a)(2)(H) and DFARS 227.7203-1(c). Consequently, the COFD is void and Lockheed Martin does not need to deliver flight software executable and source code with GPR.

## COUNT IV

## <u>Declaratory Judgment - Unilateral Mistake</u>

180.     Lockheed Martin repeats, re-alleges and incorporates by reference each allegation set forth above, as though fully set forth herein.

181.     Lockheed Martin requests a declaration from this Court that, if the Government's interpretation of the Contract is correct, the Contract must be reformed due to a unilateral mistake. Assuming the Government has the correct interpretation of CDRL A032, Lockheed Martin is entitled to a reformation of the Contract that relieves it from delivering the flight software executable and source code with GPR based on unilateral mistake.

182.     The mistake occurred prior to contract award. Prior to submitting its proposal, the Government instructed Lockheed Martin to evaluate each CDRL DID in the Final RFP and prepare its proposal based on delivering only the data specifically required in the DID. The Government stated Lockheed Martin had "historically over-provided" its intellectual property.

183.     The Government amended the Final RFP to state the Government "did not believe its minimum needs as set forth in the RFP would require Lockheed Martin to relinquish rights in technical data and computer software developed exclusively at private expense."

184.     Based upon the Government's actions, Lockheed Martin carefully scrutinized each DID for what was actually a required deliverable under the GPS IIIF Contract. Lockheed Martin confirmed this in a letter to the Government on March 30, 2018.

185.    Lockheed Martin determined that the flight software executable and source code were not contract deliverables under CDRL A032. Lockheed Martin submitted its proposal reflecting this understanding.

186.    The Government knew or should have known of Lockheed Martin's unilateral mistake at the time the proposal was accepted. Lockheed Martin's proposal revealed that it did not share the same contract interpretation with the Government regarding CDRL A032. In particular, Lockheed Martin's Model Contract contained disclosed a number of technology items that were developed at private expense. Furthermore, Lockheed Martin had not mapped its technology to particular CDRLs, and the Government did not bring this to Lockheed Martin's attention.

187.    The Government sent an Evaluation Notice to Lockheed Martin in May of 2018. However, the Government did not inform Lockheed Martin, prior to award, that the Government believed Lockheed Martin had misinterpreted the Contract, nor did the Government obtain confirmation from Lockheed Martin it intended to deliver the flight software executable and source code with GPR. As such, the Government has not met its obligation to properly verify Lockheed Martin's proposal.

188.    Nearly three years after contract award, in 2021, the Government revealed its contract interpretation regarding CDRL A032 to Lockheed Martin. In response, Lockheed Martin informed the Government of its contract interpretation regarding CDRL A032.

189.    Assuming the Government has the correct interpretation of CDRL A032, then Lockheed Martin did not discover the mistake in in its proposal until the Government made its current interpretation of the contract known to Lockheed Martin in 2021.

190.     Lockheed Martin, therefore, is entitled to a contract reformation that relieves it of the obligation to delivery executable software and source code with GPR.

## COUNT V

### Declaratory Judgment - Mutual Mistake

191.     Lockheed Martin repeats, re-alleges and incorporates by reference each allegation set forth above, as though fully set forth herein.

192.     Lockheed Martin requests a declaration from this Court that, if the Government's interpretation of the Contract is correct, the Contract must be reformed due to a mutual mistake.

193.     Prior to submitting its proposal, the Government instructed Lockheed Martin to evaluate each CDRL DID in the Final RFP and prepare its proposal based on delivering only the data specifically required in the DID. The Government stated Lockheed Martin had "historically over-provided" its intellectual property.

194.     The Government amended the Final RFP to state the Government "did not believe its minimum needs as set forth in the RFP would require Lockheed Martin to relinquish rights in technical data and computer software developed exclusively at private expense."

195.     Based upon the Government's actions, Lockheed Martin carefully scrutinized each DID for what was actually a required deliverable under the GPS IIIF Contract. Lockheed Martin confirmed this in a letter to the Government on March 30, 2018.

196.     Lockheed Martin determined that the flight software executable and source code was not a contract deliverable under CDRL A032 and, therefore, believed it would have to relinquish rights in technical data and computer software developed exclusively at private expense. Lockheed Martin submitted its proposal reflecting this understanding.

197.     Assuming this Court adopts the Government's interpretation of this Contract, then both the Lockheed Martin and the Government were mistaken in their interpretation of the

CDRL A032 requirements such that the Contract would not require Lockheed Martin or its subcontractors to relinquish rights in technical data and computer software developed at private expense.

198.    Lockheed Martin's and the Government's mistaken beliefs constitute a basic assumption underlying the Contract.

199.    Lockheed Martin's and the Government's mistaken beliefs had a material effect on the bargain.

200.    Lockheed Martin would have prepared its proposal differently were it not for its mistaken belief that flight software executable and source code were not deliverables under CDRL A032.

201.    The Contract did not place the risk of mistake on Lockheed Martin. The Government's demand that Lockheed Martin deliver the flight software executable and source code with GPR violates the statutory protections afforded to contractors under 10 U.S.C. § 2320(a)(2)(H).

202.    Lockheed Martin, therefore, is entitled to a contract reformation that relieves it of the obligation to delivery executable software and source code with GPR.

## COUNT VI

### Declaratory Judgment - Superior Knowledge

203.    Lockheed Martin repeats, re-alleges and incorporates by reference each allegation set forth above, as though fully set forth herein.

204.    Lockheed Martin undertook contract performance without vital knowledge of a fact that affected performance and cost. Specifically, Lockheed Martin was not aware that the Government required delivery of all flight software executable and source code under CDRL A032, and had no reason to believe as such based on the Government's pre-proposal conduct and

the plain language of DID 81441A.

205.    The Government was aware that Lockheed Martin had no knowledge of its requirements with respect to the delivery of all flight software executable and source code under CDRL A032. The Government knew of Lockheed Martin's interpretation of the deliverable requirements under CDRL A032 at least by receipt of Lockheed Martin's letter of March 30, 2018, if not earlier. In particular, Lockheed Martin confirmed its understanding Mr. Haag's statement that Lockheed Martin had "historically over-provided" its software and data deliverables and Mr. Haag's instruction to Lockheed Martin to evaluate each CDRL DID in the RFP based on delivering only the data specifically required in the DID.

206.    Lockheed Martin's Model Contract identified various technology items developed at private expense. Lockheed Martin's proposal also included descriptions of significant investment by the parties to the project.

207.    The plain language of DID 81441A  did not give Lockheed Martin a reason to believe there was a different interpretation or give reason to inquire about the same. Both Section 3.1 and 3.2 of DID 81441A describe requirements for "paragraphs" in the written SPS. Sections 3.1 and 3.2 tell the contractor to provide a reference to "otherwise provided" software. Sections 3.1 and 3.2 do not create software delivery obligations for the contractor.

208.    When the Government awarded the Contract to Lockheed Martin on September 14, 2018, the Government failed to inform Lockheed Martin that it expected delivery of all flight software executable and source code. The Government allowed Lockheed Martin to begin performance without revealing its contrary interpretation. The Government only affirmatively demanded its previously undisclosed requirements more than three years after contract award, when it issued its COFD.

209.    The COFD, therefore, reflects the Government's superior knowledge and is void. The Contract should be enforced with its plain language which does not require Lockheed Martin to deliver flight software executable and source code to the Government.

## COUNT VII

### Declaratory Judgment - Breach of Contract - Violation of DFARS 252.227-7014 and 252.227-7019

210.    Lockheed Martin repeats, re-alleges and incorporates by reference each allegation set forth above, as though fully set forth herein.

211.    The GPS IIIF Contract incorporates by reference the contract clauses at DFARS 252.227-7014 and DFARS 252.227-7019.

212.    DFARS 252.227-7014(e)(3) provides that, in addition to the data rights assertions made in the contract, the contractor may identify other data rights assertions after contract award when based on new information or inadvertent omissions. The clause further provides that the contractor shall submit such identifications and assertions to the contracting officer as soon as practicable prior to the scheduled delivery of the software in the clause's prescribed format, and shall ensure that an official authorized to contractually obligate the contractor signs it as an official authorized to contractually obligate the contractor.

213.    The clause does not authorize the Contracting Officer to—as the Government has done here—summarily dismiss Lockheed Martin's post-award assertion of restrictions. In fact, the clause limits a Contracting Officer' post-award assertion rejection to only when the Government can prove that "unintended omissions would have fundamentally affected the source selection decision." DFARS 252.227-7014(e)(4). Lockheed Martin was the sole offeror on the procurement, and there is no evidence the post-award assertion of restrictions would have "materially affected the source selection decision." Instead, DFARS 252.227-7014(e)(4)

authorizes the Contracting Officer to request sufficient information from the contractor to enable the contracting officer to evaluate the contractor's assertions. The clause limits the Government's right to either add the contractor's assertions to the attachment to the contract or to validate the Contractor's assertions in accordance with the procedures of the "Validation of Asserted Restrictions–Computer Software" clause of the contract, contained at DFARS 252.227-7019. Those procedures provide a mechanism for the Government to challenge a contractor's asserted restrictions and the contractor's rights and obligations.

214.    The Government breached the GPS IIIF Contract when the Contracting Officer disregarded the requirements of DFARS 252.227-7014(e)(3) & (4) by refusing to permit Lockheed Martin to exercise its contractual right to submit other assertions related to the Government's use, release, or disclosure of computer software and computer software documentation based upon new information or inadvertent omissions.

215.    The Government also breached the GPS IIIF Contract when the Contracting Officer failed to request any information to evaluate any new assertions, ignored the validation and challenge procedures incorporated into the contract at DFARS clause 252.227-7019, and issued a COFD declaring Lockheed Martin's post-award assertions were not based on new information.

216.    The Government's actions deprived Lockheed Martin of its contractual right to submit a post-award assertion in delivery of computer software and computer software documentation to be delivered with restrictions on use, release, or disclosure.

217.    Lockheed Martin was harmed as a result of the Government's breach; the Contracting Officer's denial of Lockheed Martin's contractual right to submit post-award assertions and failure to follow the validation procedures may result in the improper disclosure of

Lockheed Martin's proprietary computer software and computer software documentation to Lockheed Martin's competitors.

218.   The COFD, therefore, constitutes a breach of contract and is void.

## PRAYER FOR RELIEF

WHEREFORE, Lockheed Martin respectfully requests that the Court enter judgment for Lockheed Martin in this Complaint and further requests the following relief:

A.   For a declaratory judgment that the Government failed to comply with the terms of the Contract; and, consequentially, the COFD is void and Lockheed Martin is not required to deliver flight software executable and source code with GPR;

B.   For a declaratory judgment that under the doctrine of *contra proferentum*, Lockheed Martin is not required to deliver flight software executable and source code even if the Government's interpretation is correct and, consequentially, the COFD is void;

C.   For a declaratory judgment that the Contract interpretation put forth by the Government violates the statutory protections afforded to contractors under 10 U.S.C. § 2320(a)(2)(H), and the regulatory protections afforded to contractors under DFARS 227.7203-1(c), and, consequently, the COFD is void and Lockheed Martin does not need to deliver flight software executable and source code with GPR;

D.   For a determination that Lockheed Martin is entitled to a reformation of the Contract that relieves it from delivering the flight software executable and source code with GPR based on a mutual or unilateral mistake;

E.   For a determination that the COFD reflects the Government's superior knowledge and is void;

F.   For a declaration that the Government breached the GPS IIIF Contract when the Contracting Officer disregarded the requirements of DFARS 252.227-7014(e)(3) & (4),

and, as a result, the COFD is void; and/or

G. For any other relief the Court deems just and proper.

DATED:  December 16, 2022

Respectfully submitted,

SEYFARTH SHAW LLP

By: */s/ Donald G. Featherstun*
    Donald G. Featherstun
    SEYFARTH SHAW LLP
    560 Mission Street, Suite 3100
    San Francisco, California 94105
    Telephone: (415) 544-1019
    Facsimile: (415) 397-2823
    dfeatherstun@seyfarth.com

*Counsel of Record for Plaintiff*
*Lockheed Martin Corporation*

*Of Counsel:*

Giovanna A. Ferrari
SEYFARTH SHAW LLP
560 Mission Street, Suite 3100
San Francisco, California  94105
gferrari@seyfarth.com

Edward V. Arnold
SEYFARTH SHAW LLP
975 F Street, NW
Washington, DC 20004
earnold@seyfarth.com

88738293v.12